UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

PHILIP FIORE and

KAYLA FOGG,

Plaintiffs,

v.

TOWN OF OXFORD, a municipal corporation;

BRANDON J. CORREIA, in his individual and official capacities;

ANDRE CHASSE, in his individual and official capacities;

RICKIE JACK, in his individual and official capacities;

ZACHARY BISSON, in his individual and official capacities;

JOHN LEWIS, in his individual and official capacities;

ADAM GARLAND, in his individual and official capacities,

Defendants.


Civil Action No. _____

# I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983 and related state law arising from a multi-month campaign by Oxford police officers and municipal officials to fabricate a drug-trafficking case against Plaintiffs, destroy their reputations, and separate them from their children.

2. On March 3, 2023, Plaintiffs were **pre-textually stopped**, arrested, and jailed based on a toll-suspension administrative flag and an alleged loud exhaust. Officers then conducted warrantless, destructive vehicle searches, falsely claimed to have discovered "hidden compartments," and later swore that a TruNarc field test had confirmed narcotics—even though Oxford Police Department did not own a TruNarc device and no test was ever performed.

3. Using that fabricated "evidence" and undisclosed, biased hearsay from Plaintiff Fogg's estranged mother, Defendants obtained a residential search warrant from a sympathetic justice of the peace in another county, then executed two highly destructive searches of Plaintiffs' home at 33 Jenny Lane, Oxford, Maine.

4. During the March 6, 2023 search, officers:

   - Tried to disable or "turn down" Plaintiffs' security cameras,

   - Pepper-sprayed secured, non-aggressive dogs,

   - Used Plaintiffs' own safe keys and Bluetooth/AirTag tracking to access locked containers while later testifying they "guessed" the codes or found safes "ajar," and

   - Ripped apart walls, furniture, and vehicles while staging photographs to make the house appear like a unfit place to live

5. Despite this, no narcotics trafficking operation was ever found. Nonetheless, Defendants caused **thirty-seven (37) criminal charges** to be filed against Plaintiffs, triggered DHHS action and a jeopardy proceeding, and supported a Protection from Abuse ("PFA") order—all based on fabricated statements and omissions.

6. On June 4, 2024, after roughly sixteen months of litigation, **all thirty-seven criminal charges against both Plaintiffs were dismissed with prejudice**, with no plea, no deferred disposition, and the case collapsed because there was no real evidence—only fabricated narratives. **See Exhibit 01 & 01A (Dismissal Orders).**"

7. By then, Ms. Fogg had lost a six-figure banking career, Mr. Fiore had lost his business, both Plaintiffs had lost hundreds of thousands of dollars in income, they had incurred substantial legal fees, their property and firearms were damaged or not returned, and:

   - Ms. Fogg had been separated from her son, A.F., for approximately **567 days**, only being granted supervised visitation at DHHS once a week for a majority of time leading to his return, and

   - Mr. Fiore had been separated from his daughter for **610 days**. Mr Fiore was not allowed to talk to or see his daughter for the entire 610 days.

   - Mr Fiores' parental rights were restored by Judge Peter Malia after a PR&R hearing, Judge Malia found that OF was not at risk while in Mr Fiores' care and the testimony from Correia about the testing of the drugs was "Unclear"

8. Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief, and all other remedies available at law and in equity.

## II. RULE 7.1 DISCLOSURE

9. Plaintiffs are natural persons. They have no parent corporations and no publicly held corporation owns any interest in them.

---

## III. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert claims under the United States Constitution and 42 U.S.C. § 1983 and § 1988.

11. The Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

12. Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) because all events giving rise to these claims occurred in Oxford County, Maine, and all Defendants reside in Maine.

---

## IV. PARTIES

### A. Plaintiffs

13. Plaintiff **Kayla Fogg** is a resident of Oxford County, Maine. At the time of the events, she worked for TD Bank in a Vice President role within Retail Card Services, earning approximately $120,000 per year plus bonuses and was on track for a further promotion.

14. Plaintiff **Philip Fiore** is a resident of Oxford County, Maine, a college graduate and lawful firearms owner, who at the time was employed as a home inspector for East Coast Property

Management and a self employed appliance technician who also operated an event rental and services businesses generating roughly $110,000 annually before these events.

15. Plaintiffs are the parents of minor children A.F. and O.F. (initials used for privacy). Before March 2023, both children had strong, healthy, regular relationships with their respective parent.

## B. Municipal Defendant

16. Defendant **Town of Oxford** is a Maine municipality and the political entity responsible for the Oxford Police Department ("OPD") and its policies, customs, practices, supervision, and training.

## C. Individual Defendants

17. Defendant **Detective Brandon J. Correia** was at all relevant times a detective with OPD. He was the lead investigator and primary affiant for the March 2023 searches and charges.

18. Defendant **Officer André Chasse** was at all relevant times an OPD officer who initiated the stop and arrest of Mr. Fiore, participated in the stop and arrest of Ms. Fogg, helped obtain and execute the residential search warrants, and later pursued a retaliatory bail-violation warrant.

19. Defendant **Chief Rickie Jack** was OPD's Chief of Police. He supervised and personally participated in the March 6, 2023 residential search and approved the broader course of conduct challenged here.

20. Defendant **Captain Zachary Bisson** was at all relevant times an OPD supervisor who reviewed and approved the investigation, warrant applications, and prosecutions at issue.

21. Defendant **Officer John Lewis** was at all relevant times an officer with the Norway Police Department who actively participated in the March 3, 2023 traffic operations and in executing the residential search.

22. Defendant **Adam Garland** was at all relevant times the Town Manager of Oxford and simultaneously served as a reserve police officer, creating a structural conflict between civilian oversight and law-enforcement loyalty. He participated in or ratified the use of criminal, juvenile, and tax processes against Plaintiffs, including an irregular lien against their property.

23. All individual Defendants acted under color of state law. At all relevant times they were acting within the scope of their employment as law enforcement or municipal officials.

---

# V. FACTUAL ALLEGATIONS

## A. Background: Biased Informant and Prior Targeting

24. Plaintiff Fogg's mother, **Heather Langelier**, has a long-standing history of conflict with her daughter, including alcohol abuse and interference with Ms. Fogg's parenting of A.F.

25. In the months leading up to March 2023, Langelier admits to repeatedly contacted A.F. without Ms. Fogg's knowledge, attempted to portray Plaintiffs as drug users or traffickers, and made exaggerated or false statements to authorities.

26. Rather than treat Langelier as a biased, estranged informant whose claims required careful corroboration, OPD officers embraced her narrative and began building a "drug house" case around Plaintiffs' home.

## B. March 3, 2023: Pre-textual Stops, Warrantless Vehicle Search, and False Narrative

### 1. Stop and Arrest of Fogg

27. On March 3, 2023, Plaintiff Fogg drove a 2004 Porsche Cayenne S leaving her home to get her son from school. A routine BMV check showed an **administrative toll-suspension** on the registration, not a criminal offense.

28. OPD officers nonetheless conducted a traffic stop. Ms. Fogg was immediately removed from her vehicle, handcuffed, and placed in the back of an OPD cruiser, where she remained for roughly 90 minutes before being transported to the Oxford County Jail.

29. Defendants then conducted an **investigatory search** of the Porsche without a warrant and without Ms. Fogg's consent, rummaging through the interior and cargo areas in search of evidence.

30. During and after the stop:

- No narcotics, paraphernalia, weapons, or contraband were found or mentioned despite this while in booking at the jail, she was charged with a possession ticket and it was reported to DHHS by the officers that she was in possession of "Methamphetamine Tablets" ;

- Correia later testified in Kaylas Jepordy hearing that they were "White Amphetamine Pills".

- There is no pictures, test results, or proof that these drugs ever existed or where found in the vehicle she was operating.

- Body-worn camera and police reports referenced no probable cause beyond the toll-suspension issue; and

- Officers later claimed they had observed "electronically controlled hidden compartments," when in fact the areas were ordinary factory features and open repair access points.

31. In subsequent affidavits and testimony, Defendant Correia described these ordinary features as "hidden compartments" associated with drug-trafficking, despite never documenting them with contemporaneous photographs and despite later repair documentation showing nothing unusual.

**2. Stop and Arrest of Fiore; Missing Body-Cam Video**

32. 20 minutes later on March 3, 2023, Defendant Chasse stopped Mr. Fiore while he was driving his Mini Cooper past the scene where Mrs. Fogg was stopped, allegedly for a "loud exhaust."

33. The stop escalated immediately: Mr. Fiore barely came to a complete stop before Chasse opened the door, ordered him out, and placed him in handcuffs for questioning if he was fallowing standard procedure.

34. Mr. Fiore was fully cooperative and was detained immediately fallowing his questioning related to the standard procedure of a muffler ticket traffic stop.

35. Only a **partial body-cam video** of Mr. Fiore's stop was ever produced in discovery, conspicuously omitting the initial approach, command to exit, and early interaction where the alleged basis for the stop would normally appear.

36. Plaintiffs repeatedly requested full footage. OPD never produced it. The missing video was entirely within OPD's control and should have been preserved once litigation was reasonably foreseeable.

37. The unexplained gap in body-cam footage, selectively missing the most legally significant moments, supports a strong inference that exculpatory evidence was suppressed or destroyed.

**3. Vehicle Impoundment and Damage**

38. OPD had both the Porsche and Mini Cooper towed and impounded under circumstances lacking legal justification.

39. During impoundment and search, both vehicles suffered significant interior and mechanical damage, and personal items were removed and never fully inventoried or returned.

40. Plaintiffs paid thousands of dollars in towing fees, daily storage charges, and repair costs to retrieve and fix the vehicles.

## C. Fabricated TruNarc Test and Warrant Shopping

41. To obtain a 2nd residential search warrant on March 6th, Defendant Correia swore under oath in an affidavit that he personally tested suspected narcotics using a **TruNarc device** and obtained a specific TruNarc 'scan number' showing a positive result. **See Exhibit 02 & 02A (March 3 & March 6 Affidavits)."**

42. In later sworn testimony, Correia admitted:

- OPD did **not** own a TruNarc device;

- He had **no training** on any TruNarc;

- He **did not** perform any test;

- He did not know if anyone else tested anything; and

- He could not explain the origin of the scan number he had supplied to the Judge, Stating during his testimony that the number given referred tot he department the device belonged to.

- He also testified that during the investigation leading up to the traffic stop, he had not observed anything worth noting

43. A TruNarc device generates unique scan numbers stored in a manufacturer-maintained database; such a number cannot plausibly be guessed by accident. The only reasonable conclusion is that the TruNarc claim and scan number were fabricated to mislead the issuing judicial officer.

44. Correia's warrant affidavits also:

- Presented Langelier's unchecked hearsay as reliable,

- Omitted her hostility, alcohol abuse, and interference with A.F.,

- Omitted the fact that he had **not interviewed** A.F. before seeking the warrant, and

- Failed to disclose that the warrantless vehicle search of the Porsche had yielded **no contraband whatsoever**.

45. The March 3rd warrant was obtained not from a neutral local judge presiding over the existing criminal matters, but from a justice of the peace in **another county** during normal business hours, even though Correia was also physically present at the South Paris courthouse. This "warrant shopping" further underscores the intent to secure approval from a particularly sympathetic or less scrutinizing magistrate.

## D. March 6, 2023 Search of 33 Jenny Lane

46. On March 6, 2023, relying on the fabricated TruNarc claim and other omissions, Defendants executed a search of Plaintiffs' home at 33 Jenny Lane and outbuildings.

47. Shortly before the search, while Plaintiffs were at OPD requesting the return of Ms. Fogg's cell phone—which had been seized but appeared on no warrant or inventory—Chief Jack contacted Ms. Fogg's father, Armand Norton.

48. Jack told Norton, a long-time acquaintance, that he intended to "keep [his] hands out of this," but then personally participated in and supervised the search.

49. Plaintiffs' security audio captured Chief Jack instructing Officer Chasse to "**turn down the cameras**," evidencing a conscious effort to minimize recorded documentation of what officers were about to do.

50. The same audio captured Chief Jack telling officers to "**flip everything until you see the floor**," signaling an intent to conduct a punitive, destructive search rather than a careful execution of a warrant.

51. Consistent with those instructions, officers:

- Pepper-sprayed non-aggressive dogs that were contained behind a gate;

- Tore apart furniture and fixtures;

- Smashed or removed parts of walls and cabinetry;

- Left a wooden dog gate broken in a pile with exposed nails, leading to a dog's paw being punctured and blood pooling through the home; and

- Dumped electronics and personal belongings into the snow outside, ruining them.

52. Officers searched sheds and vehicles that were not specifically described in the warrant and were not within its scope.

53. Plaintiffs' safes were opened during the search. Officers later testified that they had "guessed" the codes or found the safes slightly open. In reality, Plaintiffs' keys and AirTag-tracked safe keys had been taken into OPD custody, and audio shows officers discussing the keys and their use during the search.

54. The manner and scope of the search exceeded any legitimate law-enforcement need and was designed to create a photographic "drug house" narrative rather than to honestly document the home's pre-search condition.

## E. Charges, DHHS Action, PFA, and Favorable Termination

55. Based on the fabricated TruNarc test, exaggerated "hidden compartment" claims, and staged search photographs, Defendants caused prosecutors to bring **thirty-seven (37)** criminal charges against Plaintiffs, including serious drug and firearm counts.

56. Defendants also supplied reports and testimony to the Maine Department of Health and Human Services ("DHHS"), portraying Plaintiffs' home as dangerous and unsanitary and asserting that Plaintiffs were involved in drug trafficking.

57. Relying heavily on Defendants' statements, DHHS removed A.F. and initiated a jeopardy proceeding. Separately, a Protection from Abuse order was obtained that cut off communication with Mr. Fiore from his daughter, O.F.

58. Ms. Fogg and A.F. were separated for **567 days**, and Mr. Fiore and his daughter for **610 days**, despite there never being any substantiated finding of abuse or neglect.

59. During this same period, OPD publicized Plaintiffs' booking photos and charges on social media and via press releases, ensuring their names and faces were associated with a false drug-trafficking narrative in the community and search engines.

60. After roughly sixteen months of prosecution, on **June 4, 2024**, **all thirty-seven charges against both Plaintiffs were dismissed with prejudice**. There was no plea, no deferred disposition, and no admission of guilt. The case ended because there was no lawful evidence to sustain it.

61. DHHS ultimately closed its case without any permanent finding of abuse or neglect attributable to Plaintiffs.

62. Despite the dismissal, OPD and the Town have never publicly corrected the record. Media and online arrest reports still present Plaintiffs as if they were drug-trafficking criminals, not exonerated individuals who were wrongfully targeted.

## F. Municipal Policies, Customs, and Structural Failures

63. At all relevant times, the Town of Oxford, through its final policymakers, maintained policies, customs, or practices that were the moving force behind the harms described above, including:

64. **Failure to train and supervise** officers regarding:

- The prohibition on fabricating evidence or misrepresenting forensic tests;

- The duty to preserve and disclose exculpatory body-cam footage;

- The limits of warrantless vehicle searches and the scope of residential warrants;

- The constitutional rights of parents and children in DHHS and PFA contexts.

65. **Tolerance and ratification** of misconduct, including:

- No discipline or correction for the admitted TruNarc fabrication;

- No discipline for missing or suppressed body-cam video;

- Approval of repeated use of Langelier's biased hearsay without proper corroboration;

- Endorsement of Jack's and Bisson's conduct during the March 6 search.

66. A structural defect whereby **Town Manager Adam Garland simultaneously served as a reserve police officer**, undermining civilian oversight and creating incentives to protect OPD's narrative rather than investigate or correct misconduct.

67. Use of **tax, code, and other municipal processes**, including an irregular lien against Plaintiffs' property, to pressure and punish Plaintiffs beyond the criminal and DHHS proceedings.

68. These policies, customs, failures to train, and structural conflicts directly caused or were a moving force behind the constitutional violations and damages suffered by Plaintiffs.

---

# VI. DAMAGES (SUMMARY)

69. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered:

70. **Economic losses**, including:

- Loss of Ms. Fogg's TD Bank position and promotion path (well over $135,000 per year in salary and bonus potential);

- Forced early withraw of Ms. Foggs 401k to cover the cost of legal representation resulting in heavy penalties. (Nearly 10k in penalties)

- Loss of Mr. Fiore's job and business income (approximately $110,000 per year);

- Substantial legal fees and costs in criminal, family, and related proceedings;

- Towing, impound, total vehicles lost from seizure, and vehicle repair costs, totaling **more than $16,000**;

- Property damage to their home, outbuildings, electronics, and firearms, currently estimated to be around $18,000;

- Loss of vehicles, equipment, electronics, and other personal property that was seized, not inventoried, or never returned.

- Loss of business equipment due to cancellations forcing liquidation.

71. **Non-economic losses**, including:

- Severe emotional distress, anxiety, depression, and PTSD-like symptoms;

- Humiliation and reputational harm in their community and professions;

- Prolonged family separation (567 and 610 days);

- Loss of liberty associated with arrests, incarceration, and restrictive bail conditions;

- Ongoing fear and distrust of law enforcement and the legal system.

---

# VII. CLAIMS FOR RELIEF

*(All paragraphs below incorporate by reference paragraphs 1–71.)*

## COUNT I – UNREASONABLE SEIZURE AND FALSE ARREST

(42 U.S.C. § 1983 – Fourth Amendment)

*Against Correia, Chasse, Jack, Bisson, Lewis*

72. Defendants seized, detained, handcuffed, and arrested Plaintiffs on March 3, 2023 without probable cause to believe they had committed any crime.

73. Administrative toll-suspension and an alleged loud exhaust did not supply probable cause for custodial arrest, prolonged detention, or impoundment of vehicles.

74. Even if the initial traffic stops were lawful, Defendants unlawfully escalated them into custodial arrests and extended detentions without any new facts establishing probable cause.

75. At the time, it was clearly established that officers may not arrest a person without probable cause and may not prolong a traffic stop beyond the time reasonably required to address the alleged violation. See, e.g., *Whren v. United States*, 517 U.S. 806 (1996); *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001); *Rodriguez v. United States*, 575 U.S. 348 (2015).

76. As a direct result, Plaintiffs suffered unlawful arrest and detention, emotional distress, reputational harm, and initiation of baseless criminal charges.

## COUNT II – UNREASONABLE SEARCH OF VEHICLE (PORSCHE CAYENNE)

(42 U.S.C. § 1983 – Fourth Amendment)

*Against Correia, Chasse*

77. Defendants conducted an exploratory, warrantless search of Ms. Fogg's Porsche without her consent and without any applicable exception to the warrant requirement.

78. They rummaged through the interior and cargo areas in search of evidence despite the absence of probable cause to believe the vehicle contained contraband.

79. Their later description of standard factory features and open repair areas as "hidden compartments" was knowingly false and used to justify the unlawful search.

80. At the time, it was clearly established that warrantless searches are presumptively unreasonable and that the automobile exception requires probable cause. See *Arizona v. Gant*, 556 U.S. 332 (2009).

81. The unlawful search invaded Plaintiffs' privacy and was a necessary predicate to the fabricated warrant application and subsequent harms.

## COUNT III – UNREASONABLE SEARCH OF HOME (MARCH 6, 2023)

(42 U.S.C. § 1983 – Fourth Amendment)

*Against Correia, Chasse, Jack, Bisson, Lewis*

82. Defendants executed a residential search warrant procured by materially false statements and omissions and then exceeded the scope of that warrant.

83. Even assuming the warrant was facially valid, Defendants:

- Searched structures and vehicles not described in the warrant;

- Used excessive destructive force on property;

- Attempted to disable security cameras and stage photographs;

- Used Plaintiffs' keys and tracking information to access safes while misrepresenting how they were opened.

84. At the time, it was clearly established that officers executing a warrant must stay within its scope and may not deliberately damage property beyond what is reasonably necessary. See *United States v. Ramirez*, 523 U.S. 65 (1998).

85. As a result, Plaintiffs suffered an unconstitutional invasion and destruction of their home and property.

## COUNT IV – JUDICIAL DECEPTION / FRANKS VIOLATIONS

(42 U.S.C. § 1983 – Fourth & Fourteenth Amendments)

*Against Correia, Chasse, Jack, Bisson*

86. Defendants, particularly Correia and Chasse, knowingly or recklessly included false statements and omitted material facts in warrant affidavits, including:

- Fabricated TruNarc test results and scan number;

- False characterization of factory vehicle features as "hidden compartments";

- Omission of Langelier's bias and credibility issues;

- Omission of the lack of contraband in the Porsche search;

- Misstatements about safe access.

87. These false statements and omissions were material; without them, no reasonable magistrate would have found probable cause to search Plaintiffs' home.

88. At the time, it was clearly established that officers may not knowingly or recklessly include falsehoods or omit material facts in warrant affidavits and that warrants procured through such deception violate the Fourth Amendment. See *Franks v. Delaware*, 438 U.S. 154 (1978); *Malley v. Briggs*, 475 U.S. 335 (1986).

89. As a direct result, Plaintiffs' home was unlawfully searched, and the cascade of criminal, DHHS, and PFA proceedings followed.

## COUNT V – FABRICATION OF EVIDENCE

(42 U.S.C. § 1983 – Fourteenth Amendment Due Process)

*Against Correia, Chasse, Jack, Bisson, Lewis*

90. Defendants fabricated and manipulated evidence, including:

- The TruNarc test and scan number;

- "Hidden compartment" claims;

- Misrepresentations about safes and firearms;

- Selective or missing body-cam footage;

- Exaggerated or false descriptions of the home's condition.

91. Defendants used this fabricated evidence to obtain warrants, initiate and maintain criminal charges, and support DHHS and PFA proceedings.

92. At the time, it was clearly established that fabricating evidence to be used in judicial or quasi-judicial proceedings violates due process. See *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004).

93. The fabricated evidence was a but-for and proximate cause of Plaintiffs' prosecutions, family separation, and other injuries.

## COUNT VI – MALICIOUS PROSECUTION

(42 U.S.C. § 1983 – Fourth Amendment)

*Against Correia, Chasse, Jack, Bisson, Lewis*

94. Defendants initiated and maintained thirty-seven criminal charges against Plaintiffs without probable cause, based largely on fabricated evidence and suppressed exculpatory information.

95. Defendants continued the prosecutions despite knowing or being deliberately indifferent to the falsity of the evidence and contradictions in their own statements.

96. On June 4, 2024, all thirty-seven charges were dismissed with prejudice, constituting a favorable termination for Plaintiffs.

97. At the time, it was clearly established that initiating and maintaining criminal charges without probable cause and with malice violates the Fourth Amendment. See *Manuel v. City of Joliet*, 580 U.S. 357 (2017).

98. As a result, Plaintiffs suffered loss of liberty, legal expenses, loss of employment and business income, emotional distress, and reputational harm.

## COUNT VII – INTERFERENCE WITH FAMILIAL ASSOCIATION

(42 U.S.C. § 1983 – Fourteenth Amendment)

*Against Correia, Chasse, Jack, Bisson*

99. Defendants' fabricated reports, statements, and testimony were presented to DHHS and the courts and directly caused:

• The removal of A.F. and a jeopardy proceeding against Ms. Fogg; and

• A PFA order cutting off Mr. Fiore's contact with his daughter.

100. Plaintiffs' children were removed and kept from them based on lies about drugs, firearms, and the condition of their home—not on any actual evidence of abuse or neglect.

101. At the time, it was clearly established that parents have a fundamental liberty interest in the care, custody, and management of their children and that state actors may not interfere with family integrity based on fabricated evidence. See, e.g., *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977).

102.The prolonged, unjustified separation caused severe and lasting harm to both parents and

children.

## COUNT VIII – FIRST AMENDMENT RETALIATION

(42 U.S.C. § 1983 – First Amendment)

*Against Chasse, Jack*

103.In June 2023, Mr. Fiore contacted OPD to demand the return of his cell phone, which had been

seized but not listed on any warrant inventory.

104.Requesting return of unlawfully held property and asserting one's constitutional rights is

protected activity under the First Amendment.

105.Within minutes of that request, Defendant Chasse obtained a warrant for an alleged bail

violation, despite having no legitimate factual basis for believing Mr. Fiore had moved or

violated conditions.

106.The suspicious timing, lack of probable cause, and broader pattern of animus show that the

warrant was sought in retaliation for Mr. Fiore's protected speech.

107.At the time, it was clearly established that state actors may not take adverse action against

individuals in retaliation for exercising First Amendment rights. See *Nieves v. Bartlett*, 587 U.S.

391 (2019).

108.Mr. Fiore suffered further arrest exposure, fear, and emotional distress as a result.

## COUNT IX – MUNICIPAL LIABILITY (MONELL)

(42 U.S.C. § 1983)

*Against Town of Oxford*

109. The constitutional violations alleged in Counts I–VIII were directly caused by the Town's policies, customs, failure to train and supervise, and structural defects described in ¶¶ 63–68.

110. These include:

- Tolerance and ratification of fabricated evidence and missing body-cam footage;

- Failure to discipline or retrain officers after serious misconduct became obvious;

- Deficient training on warrant requirements, evidence preservation, and family-integrity rights;

- The conflict-ridden dual role of the Town Manager as a reserve officer, compromising oversight.

111. The Town of Oxford was the moving force behind Plaintiffs' injuries and is therefore liable for compensatory damages under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## COUNT X – MAINE CIVIL RIGHTS ACT

(5 M.R.S. § 4682)

*Against All Individual Defendants*

112. By threats, intimidation, and coercion—including false arrests, false charges, destructive searches, and manipulation of DHHS and PFA processes—Defendants interfered with Plaintiffs' exercise and enjoyment of rights secured by the United States and Maine Constitutions.

113. Plaintiffs are entitled to damages, equitable relief, and attorneys' fees under the Maine Civil Rights Act.

## COUNT XI – FALSE ARREST / FALSE IMPRISONMENT

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson, Lewis*

114. Defendants intentionally confined Plaintiffs without consent and without legal justification, causing harm and damages.

## COUNT XII – MALICIOUS PROSECUTION (STATE)

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson, Lewis*

115. Defendants initiated and maintained the thirty-seven criminal charges without probable cause and with malice; the proceedings terminated in Plaintiffs' favor; Plaintiffs suffered the damages described above.

## COUNT XIII – ABUSE OF PROCESS

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson, Garland*

116. Defendants used criminal proceedings, DHHS referrals, jeopardy proceedings, the PFA process, and a tax lien for ulterior purposes, including retaliation, coercion, and cover-up, causing additional harm to Plaintiffs.

## COUNT XIV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Maine Common Law)

*Against All Individual Defendants*

117. Defendants' conduct—fabricating evidence, destroying property, separating families, and retaliating against Plaintiffs—was extreme and outrageous and intentionally or recklessly caused Plaintiffs severe emotional distress.

## COUNT XV – NEGLIGENCE / NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

(Maine Common Law; Pleaded in the Alternative)

*Against All Defendants*

118. In the alternative to intentional claims, Defendants breached duties of reasonable care owed to Plaintiffs, foreseeably causing severe emotional distress and associated physical symptoms.

## COUNT XVI – DEFAMATION / FALSE LIGHT

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson*

119. Defendants published or caused to be published false statements implying that Plaintiffs were drug traffickers and dangerous criminals, including through social media posts and press communications. **See Exhibit 03 (Oxford PD Facebook Post).**

120. These statements were false or made with reckless disregard for their truth and placed Plaintiffs in a false light highly offensive to a reasonable person.

## COUNT XVII – CONVERSION / TRESPASS TO CHATTELS

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson, Lewis, Town of Oxford*

121. Defendants unlawfully seized, damaged, and failed to return Plaintiffs' personal property, including two vehicles, electronics, firearms, cloths, and other items, thereby converting or trespassing upon Plaintiffs' chattels.

## COUNT XVIII – TRESPASS TO LAND

(Maine Common Law)

*Against Correia, Chasse, Jack, Bisson, Lewis, Town of Oxford*

122. Defendants entered and damaged Plaintiffs' real property at 33 Jenny Lane without lawful authority or in excess of any lawful authority, causing physical damage and loss of use.

# VIII. PUNITIVE DAMAGES

123. The individual Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiffs' constitutional and statutory rights, warranting an award of punitive damages to deter similar misconduct in the future.

# IX. PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

124. Enter judgment in their favor and against all Defendants on all counts;

125. Award compensatory damages in an amount to be determined at trial;

126. Award punitive damages against the individual Defendants;

127. Award pre- and post-judgment interest as allowed by law;

128. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and the Maine Civil Rights Act;

129. Grant declaratory and injunctive relief as necessary to:

• Expunge or correct public records reflecting the dismissed charges;

• Require Defendants to return or account for all seized property;

• Require appropriate training, supervision, and policies regarding warrant practices, evidence preservation, and familial-rights protections; and

130. Grant such other and further relief as the Court deems just and proper.

---

# X. JURY DEMAND

131. Plaintiffs demand a trial by jury on all issues so triable.

Dated:    December 8th, 2025

Respectfully submitted,

_____/s/ Philip A. Fiore_____

Philip A. Fiore

33 Jenny Lane

Oxford, ME 04270

Tel: 607-345-1944

Email: PhilipFiore26@gmail.com

Pro Se Plaintiff

_____/s/  Kayla B. Fogg_____

Kayla B. Fogg

 33 Jenny Lane

Oxford, ME 04270

(207) 531-6960

Norton.KaylaB@Gmail.com

**Pro Se Plaintiff**